STEVEN O'DONNELL and
AMY O'DONNELL,

        Plaintiffs,

        v.

AMERICA AT HOME HEALTHCARE AND
NURSING SERVICES, LTD., d/b/a ANGELS
AT HOME HEALTHCARE, and RITA'S
HOMECARE SERVICES,

        Defendants.

No. 12 CV 6762

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Steven O'Donnell and his wife Amy worked for America at Home Healthcare and Nursing Services, Ltd., an in-home healthcare provider. Steven was the company's Director of Human Resources, while Amy was a nurse. In May 2011, one of America at Home's owners discovered that Steven had been paid for over 470 hours of overtime work since December 2009. Steven was fired. While the company claims that it terminated Steven because the overtime hours were unapproved, Steven claims that he was fired because he refused to comply with the owners' demand that he return all of the overtime payments (which, Steven says, he lawfully earned).

A few weeks after Steven was discharged, Amy, too, was let go. The company maintains that it fired Amy because, after Steven was terminated, the owners learned that Steven had used company funds to pay back (at an accelerated rate) a

loan Amy had taken out against her 401(k) plan; the owners believed Amy was complicit in the loan-repayment scheme. Amy, however, claims that she was fired to further punish Steven for having refused to return his overtime pay.

Steven and Amy sued America at Home (and St. Rita's Homecare Services, an assumed name of America at Home) for unlawful retaliation under Section 215(a)(3) of the Fair Labor Standards Act (Counts I and II), and for retaliatory discharge under Illinois common law (Count III). Defendants filed a motion for summary judgment on all three counts of the complaint. For the reasons discussed below, defendants' motion is granted in part and denied in part.

## I.     Legal Standard

Summary judgment must be granted where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 547 (7th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In reviewing a summary-judgment motion, a court construes all facts, and draws all reasonable inferences from those facts, in favor of the non-moving party. *United States v. P.H. Glatfelter Co.*, 768 F.3d 662, 668 (7th Cir. 2014) (quoting *Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013)).

## II.    Facts

### A.    Steven O'Donnell's Employment and Termination

In January 2009, Steven O'Donnell began working for America at Home Healthcare and Nursing Services, Ltd., an Illinois corporation that provides in-home healthcare services. *See* [69] at 2 ¶¶ 5, 7.[1] He started in accounts receivable, accounts payable, and payroll, and eventually took over as Director of Human Resources in January 2010. *See id.* at 3 ¶¶ 12, 15.[2] Steven was an hourly employee, which meant that he had to complete time sheets listing his work hours; he received bi-weekly wage payments. *See* [70] at 2–3 ¶¶ 4–5.

In May 2011, one of America at Home's owners, Rachael Fitzpatrick, reviewed Steven's payroll records and saw that Steven had claimed (and been paid for) 477.5 hours of overtime between December 2009 and May 25, 2011. *See* [69] at 7 ¶ 31; [70] at 5 ¶ 12; *id.* at 7 ¶ 21.[3] Fitzpatrick then spoke with Steven's supervisor

---

[1] Citations to the record are designated by the document number as reflected on the district court's docket, enclosed in brackets; referenced page numbers are from the CM/ECF header placed at the top of filings. The facts related in this opinion are taken largely from the parties' Local Rule 56.1 statements of uncontested facts (and replies or responses thereto), and relevant deposition testimony.

[2] In their response to paragraph 15 of defendants' Local Rule 56.1 statement, plaintiffs admit that Steven took over as America at Home's Director of Human Resources in January 2010, but then "qualify" this admission with additional facts—*e.g.*, that in April or May of 2009, Steven transferred from his position in accounts receivable to a "marketing position with minimal human resources responsibilities." *See* [69] at 3 ¶ 15. Defendants object to this qualification, arguing that the inclusion of additional facts in one's Rule 56.1 response is impermissible under the local rules. The additional facts are immaterial, and I do not rely on them. I follow the same approach regarding plaintiffs' responses to paragraphs 26, 27, and 46 of defendants' Rule 56.1 statement, to which defendants also object. (Any fact not addressed in this opinion was immaterial to the summary-judgment analysis.)

[3] The parties dispute the nature of Fitzpatrick's review. Defendants assert that Fitzpatrick "investigat[ed]" the amount of overtime Steven claimed he had worked, while plaintiffs

(and CEO of the company), Gregory Taylor, about Steven's overtime pay. *See* [69] at 2 ¶ 8; *id.* at 4 ¶ 17; *id.* at 8 ¶ 33. Taylor told Fitzpatrick that at one point he had approved Steven to work overtime on a specific project, but that Taylor did not know Steven had been collecting overtime payments for over a year. *See* March 14, 2014 Deposition of Rachael Fitzpatrick, [51] at 28, Tr. at 26:11–:16. Fitzpatrick also discussed Steven's overtime with her co-owners, Kim Metcalf-Richards and Tami Shemanski. *See* [69] at 2 ¶ 11; *id.* at 8 ¶ 34. During that conversation, the owners decided that Steven's employment with America at Home should be terminated. *See id.* at 8 ¶ 34.[4]

Steven was indeed terminated, but exactly how and when he was let go is a matter of great dispute. According to plaintiffs, Taylor (Steven's supervisor) first spoke with Steven about the overtime pay on June 3, 2011. *See* [70] at 8 ¶ 23. During that discussion, Taylor accused Steven of "committing overtime fraud." *Id.* Steven denied that he had done anything wrong, and reminded Taylor that not only

---

contend that Fitzpatrick's so-called investigation was merely a random review of payroll records, followed by a discussion with Steven's supervisor. *See* [69] at 7 ¶ 31. How or why Fitzpatrick inspected Steven's payroll records is immaterial. What is important is that Fitzpatrick did inspect those records in May 2011, and that her inspection triggered a series of events leading up to Steven's termination, as discussed below.

[4] Plaintiffs assert that any reference to the owners' conversation about Steven (and, therefore, their purported decision to terminate him) is inadmissible hearsay. *See* [69] at 8 ¶ 34. Not so. Hearsay is a statement made outside of the litigation proceeding, offered in evidence to prove the truth of the matter asserted. *See* Fed. R. Evid. 801(c). Fitzpatrick's testimony does not contain any statements that are in themselves assertions of factual matter. Her testimony merely describes the owners' collective intent: to terminate Steven. Statements describing a declarant's intentions are not hearsay. *See Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 694 (7th Cir. 2011). Moreover, even if Fitzpatrick's testimony were hearsay, it would still be admissible under the state-of-mind exception to the hearsay rule. *See* Fed. R. Evid. 803(3) (allowing into evidence statements declaring a then-existing state of mind, including plan or intent).

had Steven worked all of the overtime hours for which had been paid, but that Taylor had approved those hours, as well. *See id.* Taylor then excused himself, made a phone call, and returned to say, "We have an opportunity for you to keep your job, but you're going to have to pay back the overtime; we'll talk on Monday." *Id.*

Plaintiffs claim that on Monday, June 7, 2011, Taylor again met with Steven about the overtime payments. *See id.* ¶ 24. The two met initially around 9:30 a.m., says Steven, at which time Taylor presented Steven with a document purportedly requiring the latter to give back his overtime pay. *See id.* ¶ 24; March 20, 2014 Deposition of Steven O'Donnell, [49] at 59–60, Tr. at 57–58. Steven refused to sign the document, *see* [49] at 62, Tr. at 60—protesting that he had earned the overtime hours and that Taylor was violating the law, *see* [70] at 8–9 ¶ 25.[5] When Steven refused to sign, Taylor purportedly said: "Well, if I take this back to the ladies, . . . if they don't like it, you could lose your job." Steven Deposition, [49] at 62, Tr. at 60:5–

---

[5] Steven testified that when he and Taylor met on the morning of June 7, Steven refused to sign the document that Taylor presented to him. *See* [49] at 62, Tr. at 60. Steven also testified that he said Taylor was violating the law, s*ee id.* at 112, Tr. at 110:22–:23; but Steven did not explain (in his testimony) when, in relation to refusing to sign the document, he actually made this statement. Other evidence provides some clues, however. Plaintiffs allege that when Steven said Taylor was violating the law, the latter understood this to mean that Steven was claiming to have worked the overtime hours at issue. *See* [70] at 8–9 ¶ 25 (citing March 13, 2014 Deposition of Gregory Dean Taylor, [50] at 36, Tr. at 134–35). And Taylor testified that Steven made this assertion when the two met on the morning of June 7, 2011. *See* Taylor Deposition, [50] at 30, Tr. at 110:5–:21 (testifying that Steven told Taylor he had "done nothing wrong" when the two met at some time between 8:00 and 10:00 a.m. on June 7); *id.* at 36, Tr. at 134:13–135:4 (testifying that, when Taylor said "he had done nothing wrong," Taylor understood this to mean Steven felt he should not have to return the overtime wages because he had earned them). Viewing these facts in the light most favorable to plaintiffs, a reasonable inference may be drawn that Steven said Taylor was violating the law at or around the same time Steven refused to sign the document requiring the return of his overtime pay.

:9. Steven again refused to sign. *See id.*, Tr. at 60:9–:10. At approximately 12:30 p.m. that same day, Steven claims that Taylor approached him once more, this time with one of the company's co-owners (Fitzpatrick) nearby. *See id.*, Tr. at 60:12–:17. Taylor said to Steven that he had "presented that [Steven] wouldn't sign" the document, and that Steven "no longer work[ed] there[;] it was [Steven's] choice." *Id.*, Tr. at 60:20–:22.

Defendants give quite a different account of what happened. While defendants admit that Taylor met with Steven on June 3 and June 7, 2011, *see* [69] at 8–9 ¶¶ 36, 38, they assert that Taylor fired Steven on the earlier—not the later—of those two dates, *see* [46] at 6 ¶ 37. According to Taylor, he told Steven on June 3 that the owners were "disappointed with [Steven's] actions" regarding the overtime payments, and that, as a result, the defendants "were going to terminate him." March 13, 2014 Deposition of Gregory Dean Taylor, [50] at 29, Tr. at 106:7–:9, :15–:16. Taylor then told Steven that he (Steven) had two options: he could resign from the company, in which case he would receive two weeks' severance pay, or he would be fired immediately. *See id.*, Tr. at 106:16–:23. It was at that point, says Taylor, that Steven defended his actions regarding the overtime and *offered* to pay back the overtime money in an effort to save his job. *See id.*, Tr. at 107:8–:19. Taylor then made a phone call to Fitzpatrick to tell her what Steven had said, after which Taylor told Steven that Fitzpatrick would have to speak with the other owners. *See id.*, Tr. at 108:2–:19. Taylor told Steven that the two could meet again the following

Monday (June 7), and that in the meantime Steven "should carefully consider the two options that [Taylor] had given him." *See id.* at 29, Tr. at 108:21–:24.

Taylor says that he met with Steven again on the morning of June 7. *See id.* at 30, Tr. at 109–11. According to Taylor, Steven began that conversation by stating that he would not agree to pay back any of the overtime pay (as Taylor claims Steven had offered to do), since he had thought about things over the weekend and had decided that he had done nothing wrong. *See id.*, Tr. at 110:17–:21. Taylor responded that the owners had discussed Steven's proposal and would not accept it anyway, and that they had left it up to Taylor to decide whether to keep Steven on as an employee (though he would necessarily be removed from his position as Director of Human Resources). *See id.*, Tr. at 111:1–:6. Taylor told Steven that, because of Steven's lack of remorse over his actions, Taylor would "continue with the termination," and that June 7 would be Steven's last day. *Id.*, Tr. at 111:7–:11.

## B. Amy O'Donnell's Employment and Termination

Amy O'Donnell is Steven O'Donnell's wife. *See* [69] at 6 ¶ 27; Defendants' Answer to Plaintiffs' Complaint, [18] at 2 ¶ 4. When Steven was fired from his job at America at Home, Amy also worked there (as a nurse). *See* [69] at 9 ¶ 40. Amy performed nursing services for St. Rita's Homecare Services, as well. *See id.* St. Rita's is an assumed name of America at Home. *See id.* at 2 ¶ 9. Both provide in-home healthcare services, and both are owned by the same three individuals described above. *See id.* ¶¶ 10–11.

The parts of Amy's story most relevant to defendants' motion are those that took place after her husband was fired from America at Home. But that sequence of events stems from an earlier set of events that took place while Steven was still employed. When Steven was Director of Human Resources for America at Home, one of his responsibilities was to apply payments toward loans taken out by company employees against their 401(k) plans. *See* [69] at 5 ¶ 26. When Steven made these repayments on behalf of certain employees, however, he paid more than the minimum required—that is, he accelerated the loan payments so that the loans against those employees' respective 401(k) plans would be paid off sooner than scheduled. *See id.* at 6 ¶¶ 27–28. The individuals for whom Steven made accelerated loan payments were his wife (Amy) and two other America at Home employees, Andrea Castrajon and Michelle Buissereth-Reed. *See id.* ¶ 27. The parties dispute who ultimately provided the money to fund these accelerated payments, but agree that the money came at least initially from America at Home. *See id.* ¶ 29.[6]

When Steven was fired, Jordan Trotto replaced him as Director of Human Resources. *See* [70] at 10 ¶ 30. Trotto discovered the accelerated loan payments that Steven had made, and informed Steven's former supervisor (Taylor). *See id.* at 11 ¶ 32. Taylor, in turn, informed the company's owners. *See* [69] at 10 ¶ 46.[7]

---

[6] Defendants claim that the money came from America at Home, while plaintiffs contend that the initial payment amounts were to be reimbursed by the employees who had borrowed against their 401(k) plans in the first instance. *See* [69] at 6–7 ¶ 29, [70] at 11–12 ¶ 34.

[7] Plaintiffs argue that any discussion Taylor may have had with the company's owners is inadmissible hearsay. *See* [69] at 10 ¶ 46. It is not. Taylor's testimony concerning the

According to defendants, the owners then decided to terminate Steven's wife Amy, because they believed that Amy and Steven together had stolen money from America at Home. *See id.* at 11 ¶ 47.[8] On June 29, 2011, Amy was in fact terminated from both America at Home and St. Rita's. *See id.* ¶ 48. The other two employees whose loan payments had been accelerated by Steven (Castrajon and Buissereth-Reed) were not. *See* [70] at 12–13 ¶ 37. Those employees were instead permitted to reimburse America at Home through paycheck deductions. *See id.*

Five days before Amy was discharged, she had delivered to America at Home a request from Steven for a copy of his personnel file. *See* [70] at 10 ¶ 29; *id.* at 13 ¶ 38. The request was made under the Illinois Personnel Records Act, and included in particular a request for the document Taylor had allegedly presented to Steven on June 7, 2011—that is, the document purportedly obligating Steven to repay his overtime wages (which Steven had refused to sign). *See* [70] at 10 ¶ 30. Steven did receive from America at Home a copy of his personnel file, but it did not include the document that Steven claims to have seen on June 7. *See id.* Jordan Trotto, Steven's replacement as Director of Human Resources, spoke to Taylor about Steven's request for the June 7 document, but, according to Trotto, Taylor said the document

---

discussion is offered to show that the conversation took place, not to prove the truth of whatever was discussed.

[8] Plaintiffs object to the admission of this statement on the grounds that it is hearsay and that it lacks foundation. *See* [69] at 11 ¶ 47. Plaintiffs do not explain why the statement lacks foundation, and so have waived this argument. *See Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("[P]erfunctory and undeveloped arguments . . . are waived.") (citation omitted). Nor is the statement inadmissible hearsay. Evidence concerning the owners' decision to terminate Amy is evidence of their intent or state of mind. As discussed above at footnote 4, such evidence is not hearsay and is admissible.

no longer existed because Steven had refused to sign it. *See id.*[9] After both Steven and Amy had been let go from the company (and about a week after the latter's termination), Taylor told Clarice Heckler, another America at Home employee, that what had happened to Amy was because of her having assisted Steven in requesting his records. *See id.* at 13 ¶ 38; Declaration of Clarice Heckler, [69-15] at 2 ¶ 3.[10]

## C. Procedural History

In 2012, Steven and Amy O'Donnell filed suit against America at Home and St. Rita's, alleging that they had been fired in retaliation for Steven's refusal to

---

[9] Defendants argue that evidence of the conversation between Taylor and Trotto is inadmissible hearsay. *See* [70] at 10 ¶ 30. Statements are not hearsay if made by an opposing party (or its agent or employee concerning a matter within the scope of their agency or employment) and offered against that party. *See* Fed. R. Evid. 801(d)(2). Both Taylor and Trotto were defendants' employees, and their conversation pertains to matters within the scope of their employment—a human-resources issue (Trotto's discipline) involving one of Taylor's former supervisees. Evidence of Taylor and Trotto's conversation is therefore admissible against defendants.

Defendants also argue that is unclear from Trotto's testimony that Taylor even knew which document Steven had requested. *See* [70] at 10 ¶ 30 (citing April 17, 2014 Deposition of Jordan William Trotto, [53] at 14, Tr. at 46–47). But Trotto's testimony does not suggest that Taylor was confused about what Steven wanted. According to Trotto, Taylor told him that "the document" was no longer in Steven's personnel file because Steven had refused to sign it. *See* Trotto Deposition, [53] at 14, Tr. at 46:23–47:2. There is no evidence suggesting that on June 7 Taylor presented *more* than one document to Steven, and so a reasonable juror could conclude that when Trotto passed along Steven's request for "the letter that [Taylor had] presented to [Steven] on June 7, 2011," *see* [69-9] at 2, Taylor knew exactly what Steven was talking about.

[10] Plaintiffs argue that Taylor's statements to Clarice Heckler are inadmissible hearsay. *See* [70] at 13 ¶ 38. Taylor's statements are not hearsay because they are admissions of a party-opponent's employee. Taylor purportedly spoke to Heckler about why Amy was fired, and Amy's termination was a matter within the scope of Taylor's employment at America at Home. *See* Taylor Deposition, [50] at 21, Tr. at 75:23–75:3 ("Q: Did someone instruct Darlene [Savary, Vice President of Operations and Billing, *see id.* at 9, Tr. at 25–26] to terminate Amy? A: Yes. . . . Me."). Evidence of Taylor's comments to Heckler may be offered against defendants. *See* Fed. R. Evid. 801(d)(2).

repay his overtime wages. Plaintiffs contended that their respective terminations violated the anti-retaliation provision of the Fair Labor Standards Act. See [1] at 2–6 (Counts I, II). They also brought a claim under the Illinois common-law doctrine of retaliatory discharge. *See id.* at 6–7 (Count III). Defendants move for summary judgment on all counts of the complaint. [44].[11]

## III.    Analysis

### A.    Steven O'Donnell's FLSA Claim (Count I)

Steven alleges that America at Home terminated his employment because he refused to pay back overtime that he claims to have lawfully earned. *See* [1] ¶¶ 6–15 (Count I). This action, says Steven, violated the anti-retaliation provision of the Fair Labor Standards Act. *See id.* ¶ 15(A) (citing 29 U.S.C. § 215(a)(3)).

Section 215(a)(3) of the FLSA prohibits employers from discharging an employee because that employee "has filed any complaint or instituted or caused to be instituted any proceeding under or related to" that chapter of the Act. 29 U.S.C. § 215(a)(3). Retaliation may be demonstrated using either the direct or indirect method of proof. *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 972 (7th Cir. 2012) (citing *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 810 (7th Cir. 2005)). Under the direct method, a *prima facie* case of retaliation is established where the plaintiff has shown: (1) that he engaged in protected

---

[11] In their complaint, plaintiffs allege that Steven was never paid for two weeks' worth of overtime (between May 16 and May 25, 2011), and request in Count I a judgment that defendants violated the FLSA by failing to pay Steven for those work hours. *See* [1] ¶¶ 13, 15(A). Neither party's summary-judgment brief addresses this portion of Steven's FLSA claim, however, so I do not discuss it here.

expression; (2) that he suffered an adverse employment action; and (3) that there exists a causal link between the two. *See id.* (citing *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002)).[12] Defendants do not dispute that Steven O'Donnell suffered an adverse employment action. They instead argue that Steven cannot make out a *prima facie* case of retaliation because he has not shown that he engaged in any protected activity, and because, even if he did engage in protected activity, he still has not shown that the defendants fired him because of that activity. *See* [45] at 3–8. Neither argument is persuasive.

To have engaged in protected activity under Section 215(a)(3) of the FLSA, Steven must have filed a complaint, or instituted or caused to be instituted any proceeding, under or related to the Act. *See* 29 U.S.C. § 215(a)(3). Complaints "filed" under Section 215 need not be in writing. *See Kasten v. Saint-Gobain Performance Plastics Corp.*, — U.S. —, 131 S.Ct. 1325, 1335 (2011). Oral complaints qualify, as long as they give the employer "fair notice that the employee is invoking rights under the FLSA." *Kasten*, 703 F.3d at 975 (citing *Kasten*, 131 S.Ct. at 1334) (internal quotation marks omitted). The fair-notice standard is an objective one. *See id.* at 976 (citation omitted). Thus, an employer has received fair notice of an FLSA complaint if a reasonable employer in the same circumstances, "armed with [the]

---

[12] Under the indirect method, a *prima facie* case of retaliation is established where the plaintiff shows that after lodging a complaint about his rights, only he—and "not any otherwise similarly situated employee who did not complain"—suffered an adverse employment action even though he was otherwise performing his job satisfactorily. *See Treadwell v. Office of Ill. Sec'y of State*, 455 F.3d 778, 782 (7th Cir. 2006) (discussing retaliation under Title VII of the Civil Rights Act) (citation omitted). Steven does not allege that similarly situated individuals were treated differently, so he proceeds under only the direct method of proof.

knowledge of the relevant context," would have understood the complaint to be an assertion of rights protected by the FLSA. *Id.* at 975–76 (citations omitted).

The FLSA mandates that employees be compensated for their work, including overtime work. *See* 29 U.S.C. §§ 206(a), 207(a). Declining to pay employees for wages due to them under the Act—or, similarly, requiring employees to return wages duly earned under the Act—is a violation of the statute. Put succinctly, employers cannot (lawfully) demand that their employees work for free. But suppose that an employer does make such a demand. If the employee refuses to comply, he has engaged in activity protected by the FLSA. A refusal to work for free is an assertion of one's right to compensation under the statute—and, thus, a complaint "filed" within the meaning of the Act. *See Wilke* v. *Salamone*, 404 F.Supp.2d 1040, 1048 (N.D. Ill. 2005); *cf. Hernandez v. City Wide Insulation of Madison, Inc.*, 508 F.Supp.2d 682, 692 (E.D. Wis. 2007) (stating that the FLSA protects those who complain about unpaid overtime (citing *Skelton v. Am. Intercont'l Univ. Online*, 382 F.Supp.2d 1068, 1076 (N.D. Ill. 2005))).

An employer who receives such a complaint finds themselves in deeper water if, because of that complaint, they fire the employee who made it. Congress enacted FLSA's anti-retaliation provision in order to shield employees from having to make an unreasonable choice between standing on their labor rights and saving their jobs. *See Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292–93 (1960). Thus, discharging an employee because he refuses to provide free labor is retaliation under the FLSA. *See Wilke*, 404 F.Supp.2d at 1048; *Brennan v. Maxey's*

*Yamaha, Inc.*, 513 F.2d 179, 180–83 (8th Cir. 1975); *see also Marshall v. Parking Co. of America-Denver, Inc.*, 670 F.2d 141, 142–43 (10th Cir. 1982) (finding a Section 215(a)(3) violation where the employee was discharged for refusing to release their claim to back pay); *Wirtz v. Ross-Packaging Co.*, 367 F.2d 549, 550 (5th Cir. 1966) (similar).

The threshold question here is: Did defendants demand that Steven O'Donnell work for free? Steven was paid for 477.5 hours of overtime work between December 2009 and May 25, 2011. Steven claims that he worked all of those hours, *see* [70] at 5 ¶¶ 12, 13, and there is evidence suggesting that defendants had at least constructive knowledge that he did so. Under the FLSA, employers have a duty to inquire into the conditions prevailing in their businesses—and therefore have a duty to compensate their employees for work time of which the employer was aware, if only constructively. *See Kellar v. Summit Seating, Inc.*, 664 F.3d 169, 177–78 (7th Cir. 2011); *see also* 29 C.F.R. § 785.11 (time is "working time" and thus compensable time under the FLSA if the employer "knows or has reason to believe that [the employee] is continuing to work") (citations omitted). Here, Taylor purportedly told Steven on at least two occasions (once in the fall of 2009, and again in April 2010) that Steven could work overtime, *see* [70] at 6 ¶ 16. And several months after the second of those two instances, when Steven told Taylor that he was "still working overtime," Taylor responded: "Yes, I know[;] you're doing a good job, keep it up." Steven Deposition, [49] at 43, Tr. at 41:14–:20. The evidence also indicates that at times, Taylor actually witnessed Steven working the overtime. *See*

[70] at 7 ¶ 20. Steven submitted time sheets accounting for his overtime hours, as well. *See* Steven Deposition, [49] at 104–05, Tr. at 102:24–103:7; *see also* [69-7] (time-sheet records). Drawing all inferences in plaintiffs' favor, a reasonable juror could conclude from this evidence that defendants were at least constructively aware of Steven's overtime work—and, consequently, that Steven lawfully earned those wages under the FLSA.

Moreover, there is evidence that defendants required Steven to return those wages as a condition for keeping his job. According to Steven, when Taylor approached him on June 3 about the overtime payments, Taylor said that Steven could keep his job only if he gave back those payments. *See* [70] at 8 ¶ 23. Taylor reiterated this demand when the two met again the next Monday (June 7) by presenting to Steven a document requiring him to relinquish his overtime pay. *See id.* ¶ 24. If Steven lawfully earned his overtime wages, as just discussed, then the conditioning of his continued employment on a return of those wages was, in effect, a demand that Steven work for free. It is no matter that the demand came after Steven's work had been completed and his wages paid. Steven was entitled to retain any payments rightfully earned under the FLSA; a demand for their return was a retroactive demand for free labor.

There is also evidence that Steven refused to comply with defendants' demand, and thus engaged in activity protected by the FLSA. When Taylor asked Steven (on June 7) to sign a document requiring him to return his overtime payments, Steven refused. *See id.* And Steven refused again when Taylor made

clear that if he did not capitulate, Steven "could lose [his] job." Steven Deposition, [49] at 62, Tr. at 60:8–:9. Instead of agreeing to return his wages, Steven instead told Taylor that Steven had earned those wages and that Taylor was violating the law. *See* [70] at 8–9 ¶ 25. A reasonable employer in these circumstances would have understood that Steven was asserting his right to be paid for his work, and so was asserting his rights under the FLSA. (Indeed, Steven claims he referred to a violation of the FLSA specifically. *See* Steven's Deposition, [49] at 112, Tr. at 110:22–:24.)[13]

The next question is whether there is evidence suggesting that Steven was fired from his job *because* he asserted his FLSA rights. Steven, in other words, must establish causation. To demonstrate a causal link between his protected expression and his termination from America at Home, Steven must show that defendants would not have fired him but for his protected activity. *See Greengrass v. Int'l Monetary Sys. Ltd.*, — F.3d —, 2015 WL 137891, at *4 (7th Cir. Jan. 12, 2015) (quoting *King v. Preferred Technical Grp.*, 166 F.3d 887, 892 (7th Cir. 1999)). "But for" causation may be shown through direct or circumstantial evidence. *See Kasten*, 703 F.3d at 972. Direct evidence is evidence that, if believed, "will prove the particular fact in question without reliance upon inference or presumption." *Id.* at 972–73 (quoting *Volovsek v. Wis. Dep't of Agric., Trade & Consumer Prot.*, 344 F.3d

_____

[13] It is unclear from Steven's deposition testimony when, precisely, he talked about an FLSA violation. But as discussed above at footnote 5, the evidence permits a reasonable inference that Steven told Taylor on the morning of June 7 that Taylor was violating the law. A reasonable juror could in turn conclude that it was at that same time that Steven referred to the FLSA in particular.

680, 689 (7th Cir. 2003)). In practice, direct evidence typically requires an admission by the employer that they were motivated by a discriminatory (or, in this case, retaliatory) animus; such evidence is rare. *See, e.g.*, *Greengrass*, 2015 WL 137891, at *4 (citing *Benders v. Bellows & Bellows*, 515 F.3d 757, 764 (7th Cir. 2008)); *Volovsek*, 344 F.3d at 689. Circumstantial evidence, by contrast, permits a reasonable juror to infer retaliation, and may include: suspicious timing, ambiguous statements or behavior; evidence that similarly situated employees were treated differently; or evidence that the reason given for an adverse employment action was merely a pretextual one. *See Kasten*, 703 F.3d at 973 (citing *Volovsek*, 344 F.3d at 689–90).

Steven does not present direct evidence of retaliation. There is, however, sufficient circumstantial evidence to permit a reasonable inference that Steven was fired because of his protected expression—that is, because he refused to surrender his overtime wages.

As discussed above, Steven was told (by Taylor) on June 3, 2011, that Steven would lose his job unless he agreed to pay back his overtime earnings from December 2009 to May 2011. At approximately 9:30 a.m. four days later (on June 7), Steven refused to comply with this demand. *See* Steven Deposition, [49] at 59–62, Tr. at 57–60. And only three hours later, Steven was fired. *See id.* at 62, Tr. at 60. The timing of Steven's termination is at the very least suspicious, and thus supports Steven's theory that he was terminated because of his protected expression. *See Kasten*, 703 F.3d at 973 (noting that an inference of causation might

be drawn where an employee is terminated only a few hours after asserting his rights under the FLSA (citing *Lalvani v. Cook Cnty., Ill.*, 269 F.3d 785, 790 (7th Cir. 2001))).

Mere proximity in time between an employee's protected activity and his subsequent termination is rarely enough to defeat summary judgment, however. *See id.* at 974 (citing *Stone*, 281 F.3d at 644). But more than just suspicious timing is evident here. Recall that on the morning of June 7, 2011, Taylor purportedly told Steven that he (Steven) could be fired if he would not agree to return his overtime payments. More specifically, though, Steven claims that Taylor said: "[I]f I take this [refusal] back to the ladies, [and] they don't like it, you could lose your job." Steven Deposition, [49] at 62, Tr. at 60. Taylor's alleged reference to "the ladies" (*i.e.*, the company's owners) is important, because when Taylor did fire Steven at 12:30 p.m. that afternoon, Taylor also said that he had "presented" (to someone) that Steven would not return the overtime—the implication being that, after his morning meeting with Steven, Taylor did indeed notify the owners of Steven's refusal to relinquish his wages. And, when firing Steven (at 12:30 p.m.), Taylor also purportedly said that "it was [Steven's] choice." *Id.* Drawing all inferences in plaintiffs' favor, these facts plausibly suggest that not only did defendants intend to fire Steven if, in the face of their demand, he chose to assert his rights under the FLSA, but that they actually carried out this intent. Thus, there is enough evidence of a causal link between Steven's protected activity and his termination to move Steven's retaliation claim past summary judgment.

Defendants contend that Steven has not shown causation because he was in fact terminated on June 3, 2011 (not on June 7, as plaintiffs claim). *See* [45] at 5. According to defendants, the owners of America at Home discussed Steven's overtime situation during a phone conversation in May 2011,[14] and decided at that time that Steven would be discharged. *See* [46] at 6 ¶ 34 (citing Fitzpatrick Deposition, [51] at 34, 56–57, Tr. at 32, 54–55). Taylor then executed that decision, say defendants, by firing Steven on June 3, 2011. *See id.* ¶¶ 35–37. If Taylor truly did terminate Steven on June 3—days before Steven engaged in any protected activity—then his discharge could not have been *because* of that activity.

As defendants point out, plaintiffs did allege in their complaint that on June 3, 2011, Taylor told Steven that he "would have to let [Steven] go." *See* [45] at 5; [46] at 6 ¶ 37 (citing Complaint, [1] ¶ 10); [1] at 3 ¶ 10. Allegations in a complaint are binding on the party that made them, *see D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013) (citation omitted). And Taylor's statement on June 3 does suggest, as defendants urge, that the owners had already decided to fire Steven as of that date. But this evidence does not establish that Steven actually *was* terminated on that date. Steven claims that during that same meeting, after he protested that he had worked all of the overtime (and that Taylor had approved it), Taylor made a phone call to Fitzpatrick,[15] and then said (to Steven) that Steven

---

[14] *See* Fitzpatrick Deposition, [51] at 27, Tr. at 25:1–:13 (explaining that in May 2011 Fitzpatrick talked to Greg Taylor about the overtime); *id.* at 32, Tr. at 30:19–:23 (stating that she talked to the owners that same day).

[15] *See* Taylor Deposition, [50] at 29, Tr. at 108:8–:9.

could keep his job if he repaid those wages. *See* [70] at 8 ¶ 23. Even if the owners had decided before June 3 to terminate Steven, this evidence suggests that the owners reconsidered that decision—in favor of a new approach—when Steven denied any wrongdoing: Steven could keep his job, but only if he agreed to return his overtime payments. Thus, a reasonable juror could conclude that Steven was not actually discharged on June 3, as defendants urge.

Even if Steven was not in fact fired on June 3, argue defendants, his retaliation claim nonetheless fails because the owners formed the *intent* to fire him before he engaged in any protected expression. *See* [45] at 6. Where an employer has contemplated discharging its employee before learning that he engaged in any protected activity, the employer typically may proceed with that termination without violating Section 215(a)(3) of the FLSA. *See Cichon*, 401 F.3d at 811 ("[P]roceeding along lines previously contemplated . . . is no evidence whatever of causality." (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001))). But such reasoning does not apply where, as here, the record plausibly indicates that the employer's "previously contemplated" plans include an intent to fire the employee if and only if he asserts his protected rights. An employer who demands that their employee work for free, and who intends to terminate that employee if he refuses to do so, cannot escape the reach of Section 215(a)(3) by pointing to evidence that their intent to terminate was formed before any protected expression actually occurred. In such instances, the intent to terminate is in effect an intent to retaliate, and so is evidence of causation. Here, plaintiffs have presented evidence

20

sufficient to suggest that defendants intended to fire Steven unless he agreed to relinquish his overtime payments, and then fired him because he would not so agree. This is enough to establish a causal link between Steven's protected activity and his termination.

Defendants next contend that Steven's retaliation claim cannot proceed because he has not demonstrated that those who decided to fire him (*i.e.*, the company's owners) were even aware of his protected expression. To show causation, a plaintiff claiming retaliation must show that the person(s) who decided to terminate him knew about his protected activity. *See Hayes v. Potter*, 310 F.3d 979, 982–83 (7th Cir. 2002) (citing *Maarouf v. Walker Mfg. Co.*, 210 F.3d 750, 755 (7th Cir. 2000). Defendants here argue that Steven has failed to make this showing because the only person with whom Steven ever spoke about the overtime issue, and thus the only person to whom Steven allegedly "complained" about his FLSA rights, was Taylor. *See* [45] at 7. But defendants overlook evidence that Taylor himself told the owners about Steven's complaint.

As discussed above, Steven claims to have spoken with Taylor at two different times on June 7, 2011: once in the morning (around 9:30 a.m.), and again in the early afternoon (around 12:30 p.m.). It was during the morning meeting that, according to Steven, Taylor said Steven could lose his job if Taylor spoke to the owners about Steven's refusal to return the overtime pay. When Taylor approached Steven again that afternoon, not only did Taylor suggest that he had communicated Steven's protest to the owners (as discussed above), but one of the owners

21

(Fitzpatrick) was actually standing nearby. *See* Steven Deposition, [49] at 62, Tr. at 60. Viewing these facts in plaintiffs' favor, a reasonable juror could infer that the owners of America at Home did know about Steven's complaint, and that they knew about the complaint before instructing Taylor to fire Steven on June 7.[16]

Steven has presented enough evidence to make out a *prima facie* case of retaliation, and his claim must be tried unless defendants can present unrebutted evidence that Steven would have been fired absent any protected expression. *See Benders*, 515 F.3d at 764 (citing *Stone*, 281 F.3d at 644). Defendants argue that they have provided such evidence, pointing to deposition testimony in which Taylor claims that Steven was fired because he requested and received payment for more than 470 hours of overtime that was not approved. *See* [45] at 8 (citing Taylor Deposition, [50] at 26, Tr. at 93–94). If defendants truly believed that they did not authorize Steven's overtime work, then even if they did demand that he return those payments, Steven's protected expression was not a but-for cause of his termination. His refusal to return wages was not, in other words, a refusal to work for free, but—at least in defendants' eyes—a refusal to comply with company policy

---

[16] Moreover, defendants may still be liable for retaliation even if they did not learn of Steven's protected expression before Taylor actually fired him. In a typical retaliation case, it is true that in order to prevail on his claim, the plaintiff must show that the relevant decision-maker knew about his protected expression. If the decision-maker did *not* know about the protected expression, then how could it be that she fired the employee because of it? But that is precisely what occurs when an employer's intent to terminate is in itself an intent to retaliate. Suppose, for example, that a business owner told one of her managers, "If an employee ever complains about an FLSA violation, fire him on the spot." In this scenario, the owner would not have learned of the protected expression before making the decision to terminate, but she would be no less liable for retaliation. Employers, in other words, cannot lawfully condition a worker's employment status on his agreement *not* to assert his protected rights.

(*i.e.*, insubordination). Discharging an employee for insubordination is not retaliation. *See Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 478 (7th Cir. 2010).

In this case, company policy did require a manager's approval for any overtime worked. *See* [69] at 4 ¶ 21. But defendants have not presented uncontradicted evidence that they genuinely believed Steven's overtime hours were unapproved. Taylor testified that they were not, but, as discussed previously, there is evidence suggesting that Taylor did approve at least some of those hours—especially those pertaining to a particular project called the "Care Anywhere" project. *See* [70] at 6 ¶¶ 16–17. According to plaintiffs, Taylor told Steven in April 2010 that he could work overtime to assist with this project, which involved bringing the company into compliance with certain requirements as identified by Lisa Skopick, another America at Home employee. *See id.* ¶ 16. Steven claims that he was still working overtime on those same compliance issues as of June 2011, when he was terminated, *see id.* ¶ 18. In any event, Skopick confirmed that the Care Anywhere project lasted for at least for a few months (through June 2010), and that Taylor did authorize Steven to work overtime during those months. *See id.* ¶ 17.

The evidence also suggests that before the owners of America at Home made even their initial decision to terminate Steven (*i.e.*, the decision they claim to have made prior to Taylor's first meeting with Steven on June 3, 2011), they, too, knew that Taylor had approved Steven to work on the Care Anywhere project. *See* Fitzpatrick Deposition, [51] at 27–28, Tr. at 25–26 (testifying that Fitzpatrick asked

Taylor in May 2011 if he had approved any of Steven's overtime, and that Taylor said he had approved work for a project the previous year). Even assuming that the Care Anywhere project lasted only from April through June 2010, as Lisa Skopick recalled—and assuming (in plaintiffs' favor) that the only overtime hours Steven claimed for those months were hours worked on that specific project—then defendants knew, at a minimum, that Taylor had approved more than 100 hours of Steven's overtime. *See* [69-7] at 5–17 (Steven's time sheets from April 3, 2010 to June 26, 2010). This evidence casts doubt on defendants' assertion that they genuinely believed Steven's overtime work was unauthorized.

There exists a genuine issue of fact concerning whether the owners of America at Home fired Steven for insubordination (as defendants urge), or for refusing to work for free (as plaintiffs claim). Where there are conflicting indications of motive and intent, summary judgment is inappropriate. *See Kasten*, 703 F.3d at 974 (citation omitted). Defendants' motion for summary judgment on Count I of plaintiffs' complaint is therefore denied.

### B.    Amy O'Donnell's FLSA Claim (Count II)

Steven's wife Amy also worked for defendants before she, too, was fired from her position. Amy was let go on June 29, 2011, just a few weeks after Steven was terminated. *See* [69] at 11 ¶ 48. Defendants claim that they terminated Amy because they believed that she and Steven (when he was still working there) had used company funds to pay off Amy's 401(k) loans, and so had stolen money from America at Home. *See* [45] at 10–11; *see also* [69] at  11 ¶ 47. Amy, on the other

hand, claims that she was fired because of her relationship with Steven, and in (further) retaliation against Steven for having asserted his FLSA rights. *See* [68] at 10–12.

As Amy does not contend that she herself engaged in any activity protected by the FLSA, she proceeds not under the traditional theory of retaliation (as addressed above) but under the zone-of-interests theory as articulated in *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 131 S.Ct. 863 (2011). In *Thompson*, the Supreme Court confronted a case in which an employee's fiancé (also an employee with the same company) was fired after the former filed with the Equal Employment Opportunity Commission a complaint alleging sex discrimination. *See* 131 S.Ct. at 867. The discharged fiancé then filed a claim of retaliation under Title VII of the Civil Rights Act. *See id.* The Court concluded that, even though the fiancé himself had not engaged in any protected activity, his retaliation claim could go forward because: (1) firing a person's fiancé could dissuade her from engaging in activity protected by Title VII, *see id.* at 868 (discussing the test for "adverse employment action" as articulated in *Burlington N. & S.F.R. Co. v. White*, 548 U.S. 53 (2006)); and (2) the fiancé was not an "accidental victim" of the employer's retaliation against the worker who had complained, and so he fell within the "zone of interests" protected by Title VII, *see id.* at 870. Defendants here argue that *Thompson* does not support Amy's retaliation claim because Steven did not engage in any protected expression (and so Amy cannot have been fired because of any such

expression), and because defendants have otherwise provided a non-retaliatory reason for letting her go. *See* [45] at 9–11. Both arguments are unavailing.

First, while it is defendants' position that Steven never asserted his rights under the FLSA, this position is contradicted by evidence discussed above in relation to Steven's retaliation claim. There are issues of fact surrounding Steven's allegedly protected activities, and so summary judgment may not be awarded on this ground.

Defendants argue next that even if Steven did engage in protected activity, Amy's claim still does not satisfy *Thompson* because defendants have offered a non-retaliatory reason for her discharge: she and Steven were stealing money from the company to pay off Amy's 401(k) loan. Thus, say defendants, Steven's protected expression (if any) could not have been the but-for cause of Amy's termination. *See id.* at 10–11. But there is evidence to rebut this contention, too.

Before Amy was fired, she delivered (on Steven's behalf) a request to America at Home for a copy of Steven's personnel file. That request included specifically a request for the document that Steven claims Taylor presented to him on the morning of June 7, 2011—*i.e.*, the document purportedly requiring Steven to relinquish his overtime payments as a condition for keeping his job. *See* [70] at 10 ¶¶ 29–30; Exhibit 9 to Plaintiffs' Local Rule 56.1 Statement, [69-9] at 2 (Steven's written request). Amy was fired five days later. *See* [70] at 10 ¶ 29; 13 ¶ 38. The timing of Amy's termination is certainly suspicious. And other circumstantial evidence weighs in her favor, too—for example, Taylor's statement to another

employee that Amy was fired because she helped Steven request his personnel records. *See* [70] at 13 ¶ 38; Heckler Declaration, [69-15] at 2 ¶ 3. Taylor's comment not only suggests an inconsistency in defendants' explanation for why Amy was fired—which in itself can be suggestive of pretext, *see Kasten*, 703 F.3d at 974 (citation omitted); *Vaughn v. Vilsack*, 715 F.3d 1001, 1008 (7th Cir. 2013) (citations omitted)—but also connects Amy's termination with Steven's protected behavior. If defendants fired Amy in order to further punish Steven for asserting his right to be paid, this was retaliation under *Thompson. See* 131 S.Ct. at 870 (explaining that employers cannot lawfully injure one employee as means to punishing another).[17]

What's more, Amy was not the only employee whose 401(k) loan payments were accelerated. Steven used company funds to accelerate loan payments for Andrea Castrajon and Michelle Buissereth-Reed, as well. *See* [69] at 6 ¶ 27. Of these three employees, however, Amy was the only one who was fired. Castrajon and Buissereth-Reed were instead allowed to reimburse America at Home for the payments made on their behalf. *See* [70] at 12–13 ¶ 37. Evidence suggesting that

---

[17] In their reply brief, defendants argue that *Thompson* does not support Amy's retaliation claim since that case permits third-party retaliation claims to proceed only where the employee who engaged in protected activity was punished *solely* through actions taken against a third-party employee. *See* [71] at 9–10. Amy's claim cannot meet this test, say defendants, because Steven was fired before Amy was: if Steven was punished at all, he was punished directly. *See id.* at 9. But *Thompson* is not so limited. While true that the employee-complainant in *Thompson* was punished only through the termination of her fiancé (and not directly), there is no language in the opinion suggesting that if the employer had *also* punished the complainant directly, it no longer would have been liable to the fiancé. *Thompson* explains that employers cannot harm one employee to punish another. If defendants here attempted to punish Steven by firing his wife—even if that injury was merely a continuation of the punishment already imposed by his own termination—defendants are liable to Amy for retaliation.

similarly situated employees were treated differently is also circumstantial evidence of retaliation. *See Kasten*, 703 F.3d at 973.

Taking the above facts as true, and drawing all inferences in plaintiffs' favor, the evidence raises a genuine issue of fact as to the true reason for Amy O'Donnell's termination. A reasonable juror could conclude from this evidence that defendants fired Amy to exact further punishment on Steven for having refused to give back his overtime payments, and that the reason defendants now offer for her discharge— taking money to pay back her 401(k) loan more quickly—is mere pretext. In light of this factual issue, Amy's retaliation claim must proceed to trial.

Defendants' motion for summary judgment on Count II of the complaint is therefore denied.

## C.    Plaintiffs' Retaliatory Discharge Claim (Count III)

Both plaintiffs bring a retaliatory-discharge claim under Illinois common law. *See* [1] at 6–7 (Count III). The cause of action for retaliatory discharge is "a narrow and limited exception to the employment-at-will doctrine" in Illinois. *Brooks v. Pactiv Corp.*, 729 F.3d 758, 767 (7th Cir. 2013) (citing *Zimmerman v. Buchheit of Sparta, Inc.*, 164 Ill.2d 29 (1994); *Paz v. Commonwealth Edison*, 314 Ill.App.3d 591 (2000); *Beatty v. Olin Corp.*, 693 F.3d 750, 753 (7th Cir. 2012)). To recover for retaliatory discharge, the plaintiff must prove: (1) they were fired (2) in retaliation for their activities, and (3) the discharge violated a "clearly mandated public policy." *Reid v. Neighborhood Assistance Corp. of Am.*, 749 F.3d 581, 586 (7th Cir. 2014) (citing *Palmateer v. Int'l Harvester Co.*, 85 Ill.2d 124 (1981)).

A clearly mandated public policy "concerns what is right and just and what affects the citizens of the State collectively," as is found in the State's constitution, statutes, and judicial decisions. *See Palmateer*, 85 Ill.2d at 130 (citation omitted). It is a matter that "strike[s] at the heart of a citizen's social rights, duties, and responsibilities." *Id.* Such matters include seeking compensation pursuant to the Workers' Compensation Act, *see Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 181–82 (1978), and reporting an employer's criminal activity (*i.e.*, "whistle-blowing"), *see Palmateer*, 85 Ill.2d. at 132–33. But after first recognizing and defining the tort of retaliatory discharge in *Kelsay* and *Palmateer*, the Illinois Supreme Court began to express a reluctance to extend the doctrine any further. *See Sutherland v. Norfolk S. Ry. Co.*, 356 Ill.App.3d 620, 625 (2005) (collecting cases).

Neither whistle-blowing nor a workers'-compensation claim is at issue here: Steven and Amy claim to have been terminated because Steven asserted his right to be paid for his work. If defendants fired Steven and Amy because of this assertion, did their terminations violate a clearly mandated public policy of Illinois? Counts I and II of the complaint concern federal wage law, as discussed above, but there is a parallel state statute—the Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq.*,— that also requires workers be paid for their labor, including overtime. *See id.* at 105/4(a)(1) (minimum hourly wage); *id.* at 105/4a(1) (overtime wage). In *Robbins v. City of Madison*, the Illinois Court of Appeals observed that if an employee was discharged for refusing to work for wages less than those set forth in the Act, the court "believe[d] that . . . his discharge would . . . violate a clear mandate of [Illinois]

public policy." 193 Ill.App.3d 379, 383 (1990) (discussing Section 2 of the IMWL, which provides that it is against public policy for an employer to pay his employees an amount less than that fixed by the Act) (internal quotation marks omitted). But the language in *Robbins* was dictum: the appellate court affirmed the lower court's dismissal (with prejudice) of the plaintiff's claims. *See id.* at 385. Moreover, the Illinois courts have since reaffirmed, repeatedly, their desire to limit the reach of the retaliatory-discharge doctrine. *See, e.g.*, *Metzger v. DaRosa*, 209 Ill.2d 30, 44 (2004) ("[T]his court has consistently sought to restrict the common law tort of retaliatory discharge." (citing *Fisher v. Lexington Health Care, Inc.*, 188 Ill.2d 455, 467 (1999))); *Irizarry v. Ill. Cent. R.R. Co.*, 377 Ill.App.3d 486, 490 (2007) ("[A]s the law stands today, the tort of retaliatory discharge is available only under two situations: (1) where the discharge stems from exercising rights pursuant to the . . . Workers' Compensation Act . . . or (2) where the discharge is for 'whistleblowing' activities . . . ." (citing *Jacobsen v. Knepper & Moga, P.C.*, 185 Ill.2d 372 (1998); *Sutherland*, 356 Ill.App.3d at 626)); *Sutherland*, 356 Ill.App.3d at 626 (same) (citations omitted); *Chicago Commons Ass'n v. Hancock*, 346 Ill.App.3d 326, 328–29 (2004) (similar) (citing *Jacobsen*, 185 Ill.2d at 376); *Shakboua v. City of Chicago*, No. 1-13-1804, 2014 IL App (1st) 131804-U, at *4 (Ill. App. Ct. Oct. 14, 2014) (similar) (citations omitted).

Of particular significance here is that courts in Illinois have explicitly refused to apply the tort of retaliatory discharge to terminations based on an employee's assertion of rights under the Illinois Wage Payment and Collection Act. *See, e.g.*,

*Chicago Commons*, 346 Ill.App.3d at 330 (discussing *McGrath v. CCC Info. Servs., Inc.*, 314 Ill.App.3d 431 (2000)). Wage disputes, the courts have found, involve personal matters that do not implicate the State's clearly mandated public policy. *See id.* (citing *Zientara v. Long Creek Twp.*, 211 Ill.App.3d 226, 244 (1991)). Such "wage disputes" include an employer's threat to deduct from future wages a worker's alleged overpayment, *see id.* (discussing *Kavanagh v. KLM Royal Dutch Airlines*, 566 F.Supp. 242 (N.D. Ill. 1983))—a situation not too dissimilar from the one presented here.

In light of the state courts' express admonition against expanding the retaliatory-discharge doctrine, and in light of their decision not to extend the doctrine into wage-related disputes specifically, I conclude that plaintiffs may not bring an action for retaliatory discharge based on an assertion of rights protected by the IMWL. *Accord Wilke*, 404 F.Supp.2d at 1049–50; *Trochuck v. Patterson Cos., Inc.*, 851 F.Supp.2d 1147, 1151 (S.D. Ill. 2012) (citing *Wilke*, 404 F.Supp.2d at 1049)).

A closer inspection of the IMWL itself also supports this conclusion. Where, as here, a plaintiff asserts that he was fired because he asserted rights protected by state statute, permitting a tort-based action for retaliatory discharge is akin to implying from the statute a private right of action for the discharge. *Cf. Metzger*, 209 Ill.2d at 44–45; *Sutherland*, 356 Ill.App.3d at 629. The Illinois Supreme Court has enumerated several factors to consider when determining whether a private right of action may be implied from a state statute, including: (1) whether a private

right of action is consistent with the statute's underlying purpose; and (2) whether a private right of action is necessary to provide an adequate remedy for violations of that statute. *See Sutherland*, 356 Ill.App.3d at 629 (quoting *Metzger*, 209 Ill.2d at 36).

A private right of action for retaliatory discharge would not be consistent with the intent of the Illinois General Assembly in drafting the IMWL. The legislature expressly provided for a private action to recover underpayments, but did not provide for such an action for discharging an employee for complaining about his IMWL rights. 820 ILCS 105/12(a). This strongly suggests that the legislature did not intend to *imply* a private right of action. *See Metzger*, 209 Ill.2d at 44 (discussing the *expressio unius* maxim of statutory interpretation).[18] Moreover, there is no need to imply from the IMWL a private right of action here, since plaintiffs already have an adequate remedy: resort to the FLSA. A state-law retaliatory-discharge claim is, in effect, superfluous.

Relying on *Reske v. City of Chicago*, No. 85 C 4681, 1986 WL 899 (N.D. Ill. Jan. 10, 1986), plaintiffs argue that a common-law claim of retaliatory discharge nonetheless should be permitted in this case because Illinois public policy favors uncovering unlawful terminations—especially where those terminations involve violations of Illinois law. *See* [68] at 14. Plaintiffs' reliance on *Reske* is misguided. *Reske* involved the termination of an attorney who worked for the City of Chicago

---

[18] *Expressio unius est exclusio alterius* means, "the expression of one thing is the exclusion of another." *Metzger*, 209 Ill.2d at 44 (quoting Black's Law Dictionary 581 (6th ed. 1990)).

(Robert Reske), who was fired after he signed an affidavit stating that he believed another employee (Howard Shlay) had been unfairly discharged because of his age. *See* 1986 WL 899, at *3. Critical to the district court's analysis was the fact that, in the court's view, Reske's actions paralleled the "whistle-blowing" activities discussed by the Illinois Supreme Court in *Palmateer*. *See id.* at *4 (citing *Palmateer*, 85 Ill.2d at 132–33). In both instances, the plaintiff had reported his employer's allegedly unlawful behavior—in *Palmateer*, to a law-enforcement agency; in *Reske*, to the court adjudicating Shlay's lawsuit against the City. But plaintiffs here do not claim that Steven was fired because of any such reporting. They instead allege that Steven was fired because he complained about his overtime wages. Moreover, *Reske* is not a recent case, and subsequent Illinois case law makes clear that the scope of the retaliatory-discharge action is exceedingly narrow.

Plaintiffs also rely on *Ladegaard v. Hard Rock Concrete Cutters, Inc.*, No. 00 C 5755, 2001 WL 1403007 (N.D. Ill. Nov. 9, 2001), for the proposition that requiring an employee to relinquish a valid claim to wages violates Illinois public policy, and thus supports a claim for retaliatory discharge under Illinois common law. *See* [68] at 14. *Ladegaard* does refer to the IMWL and IWPCA as involving "public rights." *See* 2001 WL 1403007, at *6 (citations omitted). But *Ladegaard* does not address whether the matters of public concern as reflected in those statutes are also "clearly mandated" public policies within the meaning of *Kelsay* and its progeny.

At issue in *Ladegaard* was whether, as a matter of contract law, certain private agreements (written waivers of plaintiffs' claims to back pay) were unenforceable because they abrogated wage laws involving public rights. *See id.* at *1, *6. The "public rights" on which the court based its decision were not the same kind of rights that Steven claims to have asserted before he was fired. The IMWL provides that if an employee has not collected damages for an underpayment of wages, the Director of Labor may file an action (under Section 12(b)) to recover those amounts. *See* 820 ILCS 105/12(b). In certain instances, the Illinois courts have observed that civil actions brought by a state agency to enforce compliance with a wage law, such as actions filed pursuant to Section 12(b) of the IMWL, involve a public right. *See People ex. rel. the Dep't of Labor v. K. Reinke, Jr. and Co./Reinke Insulation*, 319 Ill.App.3d 721, 727, 746 N.E.2d 12, 16 (2001); *People ex rel. Martin v. Schwartz Oil Field Servs., Inc.*, 203 Ill.App.3d 903, 907, 561 N.E.2d 201, 203 (1990). It is on those cases that the district court in *Ladegaard* relied. *See* 2001 WL 1403007, at *6 (citing *Reinke*, 756 N.E. 2d at 16; *Martin*, 561 N.E.2d at 203). Moreover, *Ladegaard* concludes that *both* the IMWL and IWPCA involve public rights, and so neither can be abrogated by private agreement. *See id.* But the Illinois courts have made clear that an employer who discharges an employee for asserting his rights under the IWPCA has *not* contravened a "clearly mandated" public policy such that an action for retaliatory discharge is permitted. *See Chicago Commons*, 346 Ill.App.3d at 330 (discussing *McGrath*, 314 Ill.App.3d 431). Such

disputes, as discussed previously, are economic disputes that are personal in nature. *See id.* (citations omitted).

As plaintiffs have not established that their terminations violated a clearly mandated public policy of Illinois, they cannot, as a matter of law, proceed with their common-law claim of retaliatory discharge. Defendants' motion for summary judgment on Count III of the complaint is therefore granted.

## IV.  Conclusion

For the reasons discussed above, defendant's motion for summary judgment, [44], is granted in part and denied in part. The motion is granted insofar as it pertains to Count III of plaintiffs' complaint. The motion is denied insofar as it pertains to Counts I and II of the complaint.

ENTER:

Manish S. Shah
United States District Judge

Date:  2/17/15